**Federal Defenders
OF NEW YORK, INC.**

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director
and Attorney-in-Chief*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

April 17, 2020

**By ECF/Email**

Honorable Vernon S. Broderick
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
New York, New York 10007

Re:   United States v. FNU LNU a/k/a Jaime Morales Sanchez, 19 Cr. 688 (VSB)

Honorable Judge Broderick:

As of April 23, 2020, Jaime Morales Sanchez will have spent seven months and eleven days in jail for the crime of unsuccessfully lying in a passport application.[1] Given the nature of his offense and the age of his criminal history, his guidelines call for a sentence of one to seven months. This Court should sentence him to time served.

## Background

Jaime Morales Sanchez was raised in poverty by a single mother battling alcoholism and drug addiction. As a result of these circumstances, he too fell into drug use from an early age. He dropped out of school to work, and set off on an unstable path in life. Ultimately, it took a 14-year prison term for Mr. Morales Sanchez to break free from substance dependence, cut ties with those who dragged him down, find faith, and reinvent himself as the hard-working, serious man he is today.

Mr. Morales Sanchez's memories of his mother, Milagros, and of their life together when he was growing up, are complicated. She was an addict, incapable of properly caring for him or herself, and she was hard on him. But they shared a close and loving bond. He recalls her drinking and smoking incessantly, using narcotics, losing consciousness, and falling down inside their home. When Milagros was alert, she used corporal punishment to discipline him. She slapped him, hit him, and lashed him with a belt when he misbehaved. More often, though, she was passed out drunk

---

[1] While the Government contends that "Jaime Morales Sanchez" is not my client's real name, the Court has indicated a preference for the defendant to appear before it with a name, rather than as "FNU LNU." *See* Arraignment Transcript, Oct. 4, 2019, at 2:10-3:4; Plea Transcript, Jan. 30, 2020, at 5:18-6:20. Accordingly, I refer to him in this letter as "Jaime Morales Sanchez."

or high, leaving Mr. Morales Sanchez to wander out of their home and hang out in the streets—streets that were not safe for a bold boy without supervision. One example stands out: When he was only eight-years-old, he found a bullet in front of his house and, with the rashness and obliviousness of a child, held it up to a flame. The bullet casing exploded, propelling shell fragments into his leg. Milagros found someone to tend to his injuries at home—by removing the fragments right there, without proper surgical tools or anesthetics—rather than taking him to the hospital. She was fearful about what questions the episode might provoke. On that one occasion, she did not discipline him for his misbehavior. He had suffered enough.

Given the sway drugs and alcohol held over his mother and the easy access to drugs in his own home, it is no surprise that Mr. Morales Sanchez first experimented with marijuana when he was just nine-years-old and started experimenting with cocaine at just 13. It is also no surprise, given the poverty they faced and Milagros's inability to draw an income, that Mr. Morales Sanchez dropped out of school at age 11 and began working, performing the only jobs he was able to find, running errands for young men involved in the drug trade. As a mere child, Mr. Morales Sanchez started down what looked like the only path available to him, unable to appreciate that it led to depravity, danger, and pain.

Eventually, Mr. Morales Sanchez's involvement with narcotics landed him in prison. In 1991, he pleaded guilty to criminal possession of a controlled substance and was sentenced to a term of four years to life under the harsh Rockefeller drug laws. In 1993, while still serving that initial sentence on work release, he became panicked about having no money to survive after his release from incarceration. Foolishly, he went looking for someone he believed owed him $200. Instead of the money, he ended up with a second conviction, for attempted kidnapping, and an additional prison sentence of 6 to 12 years. Ultimately, Mr. Morales Sanchez spent 14 years, from May 19, 1990 to May 4, 2004, in the custody of the Department of Corrections and Community Supervision.

These were long and painful years. He lost his mother. For better or worse, he also lost touch with many people from his prior life. Nevertheless, especially after his second conviction, he put his time to good use.[2] He obtained his GED. He took college courses for two years, working towards an associate degree in general business management until the funding for those courses was slashed. He participated in substance abuse treatment, Alcoholics Anonymous, Narcotics Anonymous, and anti-violence classes. He worked in each of the eight facilities

---

[2] Regretfully, I do not have Mr. Morales Sanchez's DOCCS records, which I had hoped to provide to the Court as a testament to his rehabilitation during that long prison sentence. My office requested them in early March with a return date of March 24, 2020. This week, we learned that our records request had been referred to the DOCCS Internal Records Center in Albany and that no one in that office has been copying and mailing records since mid-March due to the COVID-19 pandemic.

Case 1:19-cr-00688-VSB   Document 22   Filed 04/17/20   Page 3 of 6

| | |
|---|---|
| U.S. v. FNU LNU a/k/a Jaime Morales Sanchez | April 17, 2020 |
| Hon. Vernon S. Broderick | Page 3 of 6 |

through which he was shuttled. Over the years, he was a factory worker, an upholsterer, a law librarian, a kitchen worker, and more. He found religion. And he avoided trouble, never affiliating with any gang. Indeed, during Mr. Morales Sanchez's presentence interview, when asked about gang affiliations, he responded, "The only gang I belong to is God's gang."

On May 4, 2004, Mr. Morales Sanchez was released on lifetime parole supervision. In 2008, after four years of perfect compliance, he made the mistake of attempting to cross the border into Canada, as a tourist, without his parole officer's approval. He was arrested for violating his parole. But this arrest had a bright, silver lining. When he came back to court on the violation, his lifetime parole term was terminated. And from 2008 until his arrest in this case, he had no involvement in the criminal justice system except—unfortunately—as a robbery victim.

In one of my early meetings with Mr. Morales Sanchez, back in November, he told me, "They say corrections doesn't fix a person, but it fixed me. It made me a responsible hard working person. It made me appreciate life more. It fixed my [drug] habit. It changed me." These were not mere words: Since 2004, Mr. Morales Sanchez's life has revolved around his work and his faith. He has worked as a commercial driver for food distribution and moving companies for many years, most recently driving long distances for 80 hours every week. He is an active member of his church, Sacred Heart of Jesus, and before his arrest attended services every Sunday and study group every Wednesday. He delivered food with church members on Thanksgiving.

For the last two years, he has been in a relationship with a kind woman named Cirila Castillo, a school bus monitor who shares his dedication to the church. If released, Mr. Morales Sanchez would live at least temporarily with Ms. Castillo while getting back on his feet. Ms. Castillo is committed to supporting him during his reentry and beyond. *See* Exh. A, Letter from Cirila Castillo. Mr. Morales Sanchez is also eager to become reintegrated into his church community and start taking steps toward his goal of becoming a small business owner.

### **Time Served, More Than Seven Months, is an Appropriate Sentence**

The Federal Sentencing Guidelines call for a sentence of one to seven months for Mr. Morales Sanchez. By the time of his sentencing, he will have served more than seven months. And none of the Section 3553(a) factors would justify deviating from a top-of-the-guidelines sentence of time served to impose any additional prison time.

In selecting a sentence, this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." United States v. Douglas, 713 F.3d 694, 700 (2d Cir. 2013). That provision "directs sentencing courts to 'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)."

...

...

U.S. v. FNU LNU a/k/a Jaime Morales Sanchez  
Hon. Vernon S. Broderick

April 17, 2020  
Page 4 of 6

Id. "Those factors are, broadly speaking, proportionality, deterrence, incapacitation, and rehabilitation." Id. Seven-and-a-half months is more than sufficient to serve all these purposes in this case.

Under Section 3553(a), Mr. Morales Sanchez's experience of incarceration during the COVID-19 pandemic weighs strongly against any upward departure.[3] Even more so because, as a 59-year-old man with hypertension, Mr. Morales Sanchez is more at risk of contracting and succumbing to a severe form of the virus.

As of April 15, 44 prisoners and 124 staff at the Westchester County Jail (WCJ), where Mr. Morales Sanchez is incarcerated, had tested positive for the virus, and another 31 people were awaiting test results.[4] Although the WCJ has taken steps to try to curb the spread of the virus within its walls, those precautions have been experienced by the inmate population as punitive but ineffective. The facility's quarantine measures have significantly limited prisoners' ability to move, recreate, and gather. But, at the same time, prisoners report that they have not been provided proper protective and hygiene equipment, that high-touch surfaces are not being adequately cleaned, and that prisoners are being moved around in a manner sure to aid, rather than stop, the spread of disease.

For Mr. Morales Sanchez, this last month has been a time of fear. There are three main risk factors for contracting and dying from COVID-19: age, gender and underlying medical conditions.[5] All of them weigh against Mr. Morales Sanchez. To start, it is now apparent that the likelihood that someone will fall seriously ill and die from COVID-19 increases directly with age. Although no one is impervious to the disease, and young people are dying from it, the risks are greater for individuals in Mr. Morales Sanchez's age range.[6] But age alone does not tell the full story of a person's risk: Having an underlying medical condition increases a person's risk of severe COVID-19 symptoms beyond what their age would suggest.[7] And, unfortunately, hypertension is one of the chronic health conditions that significantly

---

[3] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (Mar. 11, 2020), at https://bit.ly/2W8dwpS; *Coronavirus Deaths Spike Abroad As New York City Becomes U.S. Virus Epicenter*, NPR (Mar. 21, 2020), at https://www.npr.org/2020/03/21/819511621/coronavirus-deaths-spike-abroad-as-new-york-city-becomes-u-s-virus-epicenter.

[4] Exhibit B, *United States v. Andre McGriff*, 20 Mag. 01761 (UA), Letter to Court from USA re: WCJ Response to COVID-19 (Apr. 16, 2020).

[5] *Groups at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention (updated April 2, 2020), at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

[6] Dylan Scott, *The Covid-19 Risks for Different Age Groups, Explained*, Vox (Mar. 23, 2020), at https://www.vox.com/2020/3/23/21190033/coronavirus-covid-19-deaths-by-age.

[7] *Id.*

elevates a person's risk.[8]  Data also show that men are significantly more likely than women to be infected with COVID-19 and twice as likely to die from the disease.[9]

Even without a global pandemic, Mr. Morales Sanchez's conditions of incarceration, first at the Metropolitan Correctional Center (MCC) and now at the WCJ, have been challenging.  The MCC was designed to hold 474 inmates and currently houses approximately 750. Journalists investigating the facility have documented "filth, rodents, overflowing sewage, deeply substandard medical care, wrenching isolation, and often indifferent—and at times, cruel—staff."[10]  Still, Mr. Morales Sanchez made the most of his situation there, working in the kitchen and praying with a community of men who convened for church and helped one another process their mistakes and emotions.  A few days after his guilty plea, though, Mr. Morales Sanchez was transferred to the WCJ.  Since his transfer, he has missed his church community and the sense of purpose and mental diversion that he gained from his food service work at the MCC, as he has been prohibited from holding a job at the WCJ because of his status as a federal, rather than state, detainee.

It is appropriate for the Court to consider the conditions of Mr. Morales Sanchez's confinement and the impact of COVID-19 on his health and experience of custody.  See, e.g., Sent'g Tr., United States v. Ozols, 16 Cr. 692 (JMF), at 30:20-31:14

---

[8] Allison Aubrey, *Who's Sickest From COVID-19? These Conditions Tied to Increased Risk*, NPR (Mar. 31, 2020), at https://www.npr.org/sections/coronavirus-live-updates/2020/03/31/824846243/whos-sickest-from-covid-19-these-conditions-tied-to-increased-risk; Dara Lee Lewis, MD, *How Does Cardiovascular Disease Increase the Risk of Severe Illness and Death from COVID-19?*, Harvard Health Blog (April 2, 2020), at https://www.health.harvard.edu/blog/how-does-cardiovascular-disease-increase-the-risk-of-severe-illness-and-death-from-covid-19-2020040219401.

[9] Roni Caryn Rabin, *In N.Y.C., The Coronavirus Is Killing Men at Twice the Rate of Women*, New York Times (Apr. 7, 2020), at https://www.nytimes.com/2020/04/07/health/coronavirus-new-york-men.html. Data released by the New York City Department of Health and Mental Hygiene illustrate the particularly high risk faced by a person who, like Mr. Morales Sanchez, checks all three of these boxes. Looking at the City's COVID-19 cases and deaths as of today, April 17, 2020:  Fifty-two percent of COVID-19 cases in New York City were in people 50 and over.  *NYC Covid-19 Cases*, NYC Health (Apr. 17, 2020), at https://www1.nyc.gov/assets/doh/downloads/pdf/imm/covid-19-daily-data-summary-04172020-1.pdf.  Thirty-six percent of cases were in adults between 45- and 64-years-old.  *Id.*  Fifty-three percent of cases were in men.  *Id.*  A total of 4843 men had died in the City of COVID-19, compared with 3033 women.  *NYC Covid-19 Deaths*, NYC Health (Apr. 17, 2020),  at https://www1.nyc.gov/assets/doh/downloads/pdf/imm/covid-19-daily-data-summary-deaths-04172020-1.pdf.  Of people ages 45- to 64-years-old, 1563 people with an underlying medical condition, including hypertension, had died, compared with 30 people with no underlying medical condition and 195 people whose underlying conditions were unknown.  *Id.*

[10] Jeanne Theoharis, *I Tried to Tell the World About Epstein's Jail.  No One Wanted to Listen*, The Atlantic (Aug. 16, 2019), at https://www.theatlantic.com/ideas/archive/2019/08/real-scandal-mcc/596257/; *see also Prisoners Endure a Nightmare 'Gulag' in Lower Manhattan, Hidden in Plain Sight*, Gothamist (June 19, 2018), at https://gothamist.com/news/prisoners-endure-a-nightmare-gulag-in-lower-manhattan-hidden-in-plain-sight.

(giving defendant credit at sentencing for "what he endured at the MDC" during an eight-day blackout); Sent'g Tr., United States v. Serrano, 18 Cr. 393 (LAK), at 9:6-9 (taking into account, "in a way beneficial to [defendant], the terrible conditions that [he] endured at the MDC" during that same blackout); Sent'g Tr., United States v. Gomez Parra, 18 Cr. 869 (RA), at 12:4-6 (considering that the time defendant had spent at the MDC "was harder time and more punishment than is normally the case").

In addition, the need to prevent unwarranted sentencing disparities, another § 3553(a) consideration, also supports a guidelines sentence of time served. See 18 U.S.C. § 3553(a)(6). Courts in this District frequently impose sentences of less than seven months in cases like Mr. Morales Sanchez's for defendants with higher Guidelines ranges than his. See, e.g., United States v. Julio Augusto Gomez Parra, 18 Cr. 869 (RA) (time-served sentence of approximately 3 months where Guidelines range was 10-16 months); United States v. Luis Alfonso Lopez-Ramos, 17 Cr. 331 (JSR) (concurrent 6-month sentences for passport fraud and illegal reentry where Guidelines range was 15-21 months); United States v. Henyel Gustavo Sosa-Diaz, 19 Cr. 272 (JGK) (sentence of 4 months, to run concurrently with undischarged term of state sentence, where Guidelines range was 10-16 months); United States v. Mina Ghanem, 17 Cr. 784 (VM) (time-served sentence of 4 months where Guidelines range was 6-12 months); United States v. Rolando Caba, 17 Cr. 442 (ALC) (time-served sentence of 4 months where Guidelines range was 8-14 months,); United States v. Juan Hernandez, 18 Cr. 264 (GHW) (sentence of 6 months where Guidelines range was 8-14 months).

## **Conclusion**

In light of the foregoing, I respectfully request that the Court sentence Jaime Morales Sanchez to time served.

                                                        Respectfully submitted,

                                                        /s/ Ariel Werner
                                                        Ariel Werner
                                                        Assistant Federal Defender
                                                        (212) 417-8770

CC: AUSA Jarrod Schaeffer